UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 22-cv-20858-BLOOM/Otazo-Reyes**

CHARLENE CANYES,

      Plaintiff,

v.

CARNIVAL CORPORATION,
*doing business as*
Carnival Cruise Lines, Inc.,

      Defendant.

_____/

## OMNIBUS ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PLAINTIFF'S EXPERT WITNESSES' TESTIMONY

**THIS CAUSE** is before the Court upon Defendant Carnival Corporation, doing business as Carnival Cruise Lines, Inc.'s ("Defendant") Motion for Summary Judgment,[1] ECF No. [100] ("Summary Judgment Motion"), and *Daubert* Motion to Strike Plaintiff's Expert Witnesses,[2] ECF No. [101] ("*Daubert* Motion"). Regarding the Summary Judgment Motion, Plaintiff Charlene Canyes ("Plaintiff") filed a Response in opposition, ECF No. [106],[3] and Defendant filed a Reply,[4] ECF No. [121]. Regarding the *Daubert* Motion, Plaintiff filed a Response in opposition, ECF No. [110], and Defendant filed a Reply,[5] ECF No. [117]. The Court has reviewed the Motions, the

---

[1] Defendant also filed a Statement of Material Facts in Support of its Motion for Summary Judgment, ECF No. [99] ("SMF"), to which Defendant attached Exhibits A through J of the motion, ECF Nos. [99-1] – [99-10].

[2] Defendant also filed Exhibits A through AD in support of the Daubert Motion. ECF Nos. [104-1] – [104-31]. Exhibit AD appears to be a duplicate filing. ECF Nos. [104-30] – [104-31].

[3] Plaintiff filed a counterstatement of material facts ("CSMF"), disputing certain facts in Defendant's Statement of Material Facts, a memorandum of law in opposition to the Summary Judgment Motion, and Exhibits A through H of the Response, in a single eighty-three-page document. ECF No. [106].

[4] Defendant filed two Replies, ECF Nos. [119] and [121]. The later-filed Reply, ECF No. [121], contains three footnotes that do not appear in the earlier-filed Reply, ECF No. [119]. The Court reviews the later-filed Reply.

[5] Defendant filed an exhibit with the Reply.

supporting and opposing submissions, the record, and is otherwise fully advised.  For the reasons that follow, the Summary Judgment Motion is granted in part and denied in part, and the *Daubert* Motion is granted in part and denied in part.

## I.    BACKGROUND

This action stems from Plaintiff's injury on January 15, 2019, while a passenger on Defendant's cruise ship, *Carnival Horizon.* 3d Am. Compl. ¶¶ 11, 16, ECF No. [32-1]. According to the Third Amended Complaint, Plaintiff bent down to retrieve a bottle that had fallen out of a refrigerator on the floor of Plaintiff's cabin and adjacent to a cabin wall. *Id.* ¶ 16. As Plaintiff stood up, she forcefully struck her head on a metal latch protruding from a berth immediately above her and was injured. *Id.*[6] The metal latch secures the upper berth to the cabin ceiling. *Id.* The Third Amended Complaint asserts three claims: Count I – Negligent Maintenance of the Passenger Cabin, Count II – Negligent Design and Construction, and Count III – Negligent Failure to Warn. *Id.* ¶¶ 15-47.

### A.  Summary Judgment Motion

Defendant seeks summary judgment on all Counts, raising four principal arguments. First, Defendant contends that it was not on notice of a dangerous condition. ECF No. [100] at 5-10.[7] Second, as to Count I, there is no evidence that Defendant did not maintain Plaintiff's cabin in a safe condition. *Id.* at 10-12. Third, Count II fails because no evidence demonstrates that Defendant participated in the design or construction of the *Carnival Horizon. Id.* at 12-14. Fourth, as to Count III, the alleged dangerous condition in Plaintiff's cabin was open and obvious and there was no

---

[6] A berth is a place to sit or sleep on a ship. *Berth*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/berth (last visited Oct. 3, 2023).
[7] The Court generally cites to the page of a filing indicated by the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings. However, when citing to deposition transcript, the Court uses the page number that is indicated on the transcript.

duty to warn.

Plaintiff responds that she need not prove that Defendant was on notice because Defendant created the dangerous condition that caused her injuries by designing Plaintiff's cabin. ECF No. [106] at 5-8. Alternatively, Plaintiff maintains Defendant was on notice by virtue of the occurrence of a similar incident seven months prior to her injuries. *Id.* at 8-10.

## B. *Daubert* Motion

Alternatively, Defendant seeks to exclude all of Plaintiff's experts from testifying at trial. Those experts include (1) Dr. Melissa Ortiz-Becher, Psy.D., LMHC ("Ortiz-Becher"), Plaintiff's treating clinical psychologist; (2) Tamar Fleischer, R.N. ("Fleischer"), who prepared Plaintiff's Life Care Plan; (3) Amanda Marie Sizemore, M.S. ("Sizemore"), who prepared a Vocational/Disability Evaluation Report; (4) Dr. Kenneth Eugene Lehrer ("Lehrer"), an economist who prepared a report on Plaintiff's economic damages; (5) Dr. Gerald M. Goldhaber, Ph.D. ("Goldhaber"), an expert on organizational communication who submitted a report on Defendant's purported failure to warn Plaintiff of the dangerous condition; (6) Roy J. Scott ("Scott"), a former U.S. Coast Guard Marine Inspector and Investigator who prepared a report on vessel accommodation design standards; (7) Dr. Jose Pizarro, M.D. ("Pizarro"), Plaintiff's treating radiologist; (8) Dr. Nicholas D. A. Suite, M.D. ("Suite"), Plaintiff's treating neurologist; and (9) Dr. Cheri Surloff Ph.D., Psy.D. ("Surloff"), Plaintiff's treating neuropsychologist. Defendant contends their opinions are not based on sufficient facts or data under Rule 702 of the Federal Rules of Evidence, and their applied methodologies fail to meet the standard for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). ECF No. [101] at 3-20. Moreover, Defendant asserts that Surloff, Fleischer, Sizemore, Scott, and Goldhaber are not qualified to offer expert opinions. *See generally id.*

Plaintiff generally responds that Defendant's disagreements with her experts' opinions go

to the weight of their testimony, not to the admissibility of that testimony. ECF No. [110] at 2-4. Plaintiff also responds that Fleischer, Ortiz-Becher, Sizemore, Scott and Goldhaber are qualified to opine in this case. *Id.* at 4-6. Finally, Plaintiff maintains Scott and Goldhaber's methodologies are sufficiently reliable under *Daubert*. *Id.* at 6-8.

### C. Material Facts

The following material facts are undisputed unless otherwise noted.

### i. The Plaintiff's Cabin

Plaintiff boarded the *Carnival Horizon* on January 12, 2019. Def.'s SMF ¶ 2, ECF No. [99]; Pl.'s CSMF ¶ 2, ECF No. [106]. On January 15, 2019, Plaintiff reached for a water bottle that had fallen out of a small room refrigerator that was located on the floor of her cabin aboard the *Carnival Horizon* that was adjacent to a wall. Def.'s SMF ¶ 1; Pl.'s CSMF ¶ 1. As she stood up, Plaintiff struck her head on a sharp metal latch protruding from the upper berth in her cabin. Def.'s SMF ¶ 1; Pl.'s CSMF ¶ 1. The metal latch secures the upper berth to the ceiling when the upper berth is not in use. Def.'s SMF ¶ 1; Pl.'s CSMF ¶ 1.

### i. The Metal Latch

The record contains a photograph of the section of the cabin where the upper berth and metal latch are located, which is reproduced below.



Borcegue Decl. ¶ 14 fig. The record also contains a close-up view of the metal latch.



ECF No. [104-24].

Plaintiff testified that the metal latch was visible from several vantage points. The metal latch is visible when entering the cabin, but one "[has] to be looking for it to see it." Mar. 10, 2023 Dep. of Charlene Canyes ("Mar. 10, 2023 Canyes Dep.") at 510:8-20, ECF No. [100-8]. The metal latch is also visible to an observer sitting directly under the upper berth. *Id.* at 510:25-511:2. The

latch is also visible to an observer who is "standing facing the wall" and the upper berth. Apr. 5, 2023 Dep. of Charlene Canyes ("Apr. 5, 2023 Canyes Dep.") at 30:3-10, ECF No. [100-6]. The metal latch is also visible when observing an individual in the cabin who is "on the bed[.]" *Id.* at 54:21-55:16.

###### ii.    Notice of June 21, 2018 Incident Involving Another Passenger

The parties dispute whether there were any reported prior incidents involving a passenger striking his/her head on a metal latch in cabins similarly configured in the Carnival fleet. Def.'s SMF ¶¶ 3, 4, ECF No. [99]; Pl.'s CSMF ¶¶ 3, 4, ECF No. [106] at 1. Specifically, Defendant's Guest Claims Manager and Corporate Representative, Monica Borcegue ("Borcegue"), states that there have been no such incidents. Decl. of Monica Borcegue ("Borcegue Decl.") ¶ 15, ECF No. [100-1]. Likewise, Borcegue testified that there were no reports or complaints about safety hazards in cabins in vessels within the *Vista* class relating to latches protruding from the bottom on bunkbeds. Tr. of May 12, 2023 Dep. of Carnival Corp. Corporate Representative Monica Borcegue ("May 12, 2023 Borcegue Dep.") at 161:7-19, ECF No. [99-3]. However, Borcegue testified that an incident occurred on June 21, 2018 in which a guest, Millie Schild ("Schild"), was in her cabin aboard the *Carnival Horizon*, the same vessel on which Plaintiff was injured, and "hit her head on the metal part of [the] bunkbed." *Id.* at 31:22-32:5. Schild provided a witness statement and received medical attention. *Id.* at 33:16-17. Schild had a cut and "was given staples to close her wound." *Id.* at 33:8-9. Borcegue testified that "they describe it as the latch bolt, but it was a similar latch bolt or a metal piece, as it was in this case." *Id.* at 32:8-11.

###### iii.    Defendant's Service of Cabins

Flavius C. Dragan ("Dragan"), Defendant's Housekeeping Manager, testified that, in January 2019, Defendant had a "policy and procedure" in which Defendant's stewards would ask

guests who are passengers aboard a Defendant's ship for their preference concerning the frequency of cabin service, such as "morning service, evening service, or both." Mar. 3, 2023 Dep. of Flavius C. Dragan ("Dragan Dep.") at 18:6-25, ECF No. [100-3]. Servicing in this context means cleaning. *See* ECF No. [100-7] at 2 ("[Guest] has requested to not have SR cleaned for entire week, as well as no linen to be changed . . . ."). Stewards would open the upper berth upon embarkation and leave the upper berth in the open position for duration of the voyage. *Id.* at 19:1-20. Dragan further testified that Plaintiff asked for the room not to be cleaned during the week "because [of] different reasons." *Id.* at 26:19-21.

### iv. Design of *Carnival Horizon*

Borcegue testified that all the cabins in the *Carnival Horizon* are "configured similarly." *Id.* at 41:17-42:16. Defendant has an employee who is the director of the New Builds Department, a department of Carnival Corporation. *Id.* at 135:12-20. The director communicates with manufacturers about the placement of the bunkbed, the fridge, and "other configurations" in the cabins. *Id.* at 135:24-136:3. When presented with a design for a cabin, the New Builds Department "look[s] at everything just to make sure that everything is functional and that everything is working as it should. At [that] point in time, [the New Builds Department] would go ahead and . . . go forward with the design." Tr. of Supp. Dep. of Borcegue ("June 26, 2023 Borcegue Dep.") at 12:14-13:16. Defendant chooses the layout of the cabin and the location of the furnishings in the cabin; however, "the cabin itself" is "up to the [manufacturer]." May 12, 2023 Borcegue Dep. at 136:12-20.

### II. LEGAL STANDARD

### A. Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990) (citation omitted).

### B. *Daubert* Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine

whether expert testimony or any report prepared by an expert may be admitted, the Court engages

in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently

regarding the matters the expert intends to address; (2) the methodology by which the expert

reaches his or her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact,

through the application of scientific, technical, or specialized expertise, to understand the evidence

or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562

(11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Court of Appeals for the Eleventh Circuit

refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among

these requirements, the court must individually analyze each concept. *See id.*

  Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not

intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel-*

*Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citations and quotation marks omitted).

Consistent with this function, the district court must "ensure that speculative, unreliable expert

testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256

(11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the

persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations and quotation

marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert

lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. On the contrary, "vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*,

326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing

counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly

evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1258).

## III.    DISCUSSION

### A.  Motion for Summary Judgment

#### i.    Maritime Law Principles

As an initial matter, the parties agree this case is governed by maritime law. "Maritime law governs actions arising from alleged torts committed aboard a ship sailing in navigable waters." *Guevara v. NCL (Bah.) Ltd.*, 920 F.3d 710, 720 (citing *Keefe v. Bah. Cruise Line, Inc.*, 867 F.2d 1318, 1320-21 (11th Cir. 1989)). "In analyzing a maritime tort case, [courts] rely on general principles of negligence law." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (quoting *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)). "To prevail on a negligence claim, a plaintiff must show that '(1) the defendant had a duty to protect the plaintiff from a particular injury, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual harm.'" *Guevara*, 920 F.3d at 720 (quoting *Chaparro*, 693 F.3d at 1336). "Each element is essential to Plaintiff's negligence claim and Plaintiff cannot rest on the allegations of her complaint in making a sufficient showing on each element for the purposes of defeating summary judgment." *Isbell v. Carnival Corp.*, 462 F. Supp. 2d 1232, 1236-37 (S.D. Fla. 2006).

"A cruise-ship operator 'is not liable to passengers as an insurer, but only for its negligence.' The mere fact of an accident causing injury is insufficient to establish that a dangerous condition existed." *D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 796-97

(11th Cir. 2019) (quoting *Keefe*, 867 F.2d at 1322); *see also Looney v. Metro. R.R. Co.*, 200 U.S. 480, 486 (1906) ("A defect cannot be inferred from the mere fact of an injury. There must be some proof of the negligence."); *Miller v. NCL (Bah.) Ltd.*, No. 15-cv-22254, 2016 WL 4809347, at *4 (S.D. Fla. Apr. 6, 2016) ("Generally, ship owners and operators do not owe a heightened or special duty of care to their passengers." (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959))), *aff'd*, 679 F. App'x 981 (11th Cir. 2017). Rather, "[u]nder maritime law, the owner of a ship in navigable waters owes passengers a duty of reasonable care under the circumstances." *Sorrels v. NCL (Bah.) Ltd.*, 796 F.3d 1275, 1279 (11th Cir. 2015).

The duty of reasonable care requires, "as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition." *Keefe*, 867 F.2d at 1322. "In other words, a cruise ship operator's duty is to shield passengers from known dangers (and from dangers that should be known), whether by eliminating the risk or warning of it." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020). However, with respect to warning passengers of dangers that are known or should be known, the cruise ship operator's duty does not extend to warning of open and obvious dangers. *See Carroll v. Carnival Corp.*, 955 F.3d 1260, 1264 (11th Cir. 2020) ("An operator of a cruise ship has a duty to warn only of known dangers that are not open and obvious." (citing *Guevara*, 920 F.3d at 720 n.5)). Thus, a cruise-ship operator's liability often "hinges on whether it knew or should have known about the dangerous condition." *Guevara*, 920 F.3d at 720; *see also D'Antonio*, 785 F. App'x at 797. "The mere fact that an accident occurs does not give rise to a presumption that the setting of the accident constituted a dangerous condition." *Miller*, 2016 WL 4809347, at *4. Moreover, a plaintiff cannot establish a breach of its duty of care unless the plaintiff shows

> (1) a dangerous condition existed; [and] (2) the vessel's operator had actual notice of the dangerous condition; or (3) if there was no actual notice, that [d]efendant had

constructive notice of the dangerous condition for an interval of time sufficient to allow the vessel's operator to implement corrective measures.

*Stewart v. Carnival Corp.*, 365 F. Supp. 3d 1272, 1275 (S.D. Fla. 2019) (quoting *Reinhardt v. Royal Caribbean Cruises, Ltd.*, No. 1:12-cv-22105, 2013 WL 11261341, at *4 (S.D. Fla. Apr. 2, 2013) (citing *Adams v. Carnival Corp.*, 2009 A.M.C. 2588, at *3 (S.D. Fla. 2009) (citing *Keefe*, 867 F.2d 1318 (11th Cir. 1989)))) (alterations in *Stewart*).

Defendant disputes whether it owed a duty to protect Plaintiff from, or warn Plaintiff of, the injury that Plaintiff suffered on January 15, 2019. *See* ECF No. [100] at 3 (asserting that a vessel owner owes a duty of reasonable care towards those lawfully aboard the vessel who are not members of the crew and that a plaintiff must show *inter alia* that a defendant had a duty to protect plaintiff from a particular injury); *id.* at 14-15. Defendant does not squarely dispute whether the metal latch posed a dangerous condition but contends that Defendant was not on notice of the hazard posed by the metal latch and that in any event the hazard was open and obvious. *Id.* 5-10. Plaintiff argues there is a dispute whether Defendant was on notice and cites to the record to show that Defendant participated in the design of *Carnival Horizon*. *See generally* ECF No. [106]. The Court address the parties' arguments in the order of the Counts in the Third Amended Complaint.

### ii.   Count I

Defendant seeks summary judgment on Count I, Negligent Maintenance of the Passenger Cabin. Defendant argues there is no evidence that Defendant breached its duty of reasonable care under the circumstances because there is no evidence that Defendant did not maintain Plaintiff's cabin in a safe condition. ECF No. [100] at 10-12.[8]

Plaintiff does not substantively respond to Defendant's argument. Plaintiff's theory of

---

[8] In making this argument, Defendant assumes *arguendo* that it was on notice of the dangerous condition posed by the metal latch. *Id.* at 10. It is Defendant's contention that it had no actual or constructive notice. *Id.* at 5-10.

liability regarding Count I is that Defendant breached its duty of reasonable care by creating a dangerous condition in her cabin, specifically by leaving the upper berth in the down or open position, which created the risk that Plaintiff would strike her head whenever she would attempt to stand up from near the open refrigerator. 3d Am. Compl. ¶ 19. Plaintiff alleges that it was Defendant's practice to have its stewards lower and raise the upper berth each day, and that a steward who would service Plaintiff's cabin would have seen the metal latch in the down position during the exercise of his or her duties during Plaintiff's cruise. *Id.* ¶ 20.

However, the record shows *no such a practice exists*. The evidence reflects that Defendants' housekeeping staff would leave the upper bunk in the down position upon embarkation and for the duration of the voyage. Dragan Dep. at 18:6-19:20. Dagan's testimony indicates that Plaintiff asked for "the room not to be cleaned during the week because [of] different reasons." *Id.* at 26:19-21. Plaintiff concedes that the upper berth stayed in the same position throughout the excursion. ECF No. [106] at 3. Thus, there is no evidence that Defendant had a practice requiring that the upper berths on its vessel cabins be raised daily by a certain time during a voyage. Crucially, there is no evidence on the record or argument by Plaintiff that indicates the implementation of such a practice was necessary for Defendant to meet its standard of reasonable care. As such, Plaintiff cannot show that Defendant's duty of reasonable care to passengers encompasses an obligation to raise the upper berth in Plaintiff's cabin daily to prevent injuries. *See Sorrels*, 796 F.3d 1275, 1279 (11th Cir. 2015) ("Under maritime law, the owner of a ship in navigable waters owes passengers a 'duty of reasonable care' *under the circumstances*.") (emphasis added). Accordingly, summary judgment is warranted as to Count I.

### iii.   Count II

*a. Notice*

Defendant contends that Count II must be dismissed because it did not breach its duty of reasonable care since it lacked notice of the dangerous condition posed by the metal latch. ECF No. [100] at 6. Defendant argues Plaintiff has failed to adduce evidence that Defendant had actual notice of the cabin's dangerous condition, or that substantially similar incidents occurred on Carnival vessels providing constructive notice, either of which would be necessary to give rise to Defendant's duty of reasonable care.  ECF No. [100] at 4-6. Defendant cites the Declaration of its corporate representative to affirmatively show there is no evidence of substantially similar events for the three years prior to Plaintiff's injury. *Id.* at 6. The record reflects that Defendant disclosed to Plaintiff one incident where a *Carnival Horizon* passenger was injured, but who was not "involve[d] with a situation where a passenger struck his or her head due to proximity to [a] cabin refrigerator." Defendant argues that incident is not substantially similar to Plaintiff's incident because the other passenger "herself caused her incident by standing too quickly and not paying attention." Def.'s 2d Am. Resps. to Pl.'s Initial Interrogs. to Def. Dated Feb. 10, 2022, No. 23, ECF No. [100-5] at 3.

Plaintiff responds that the incident that involved the other passenger is a substantially similar incident that placed Defendant on constructive notice of the dangerous condition in Plaintiff's cabin. ECF No. [106] at 9-10. In Plaintiff's view, Defendant was aware of that incident but "did nothing and allowed Plaintiff to encounter the same dangerous condition." *Id.* at 9.

The Eleventh Circuit has explained that a plaintiff can establish constructive notice by showing "conditions substantially similar to the occurrence in question must have caused the prior accident." *Jones*, 861 F.2d at 661-62; *Guevara*, 920 F.3d at 720 (citing *Jones*, 861 F.2d at 661-

62). In *Jones*, a plaintiff sought recovery for injuries sustained due to an elevator that malfunctioned, hitting the floor of an elevator shaft. *Jones*, 861 F.2d at 657-58. At issue was whether prior incidents described in maintenance reports for the elevator were substantially similar to the plaintiff's incident. *Id.* at 661. The maintenance reports indicated the elevator's "normal stopping device" malfunctioned in both a prior incident and the plaintiff's incident, meaning that both incidents were substantially similar. *See id.* at 662.

Here, Defendant's corporate representative testified about the incident with a cruise passenger that occurred on the *Carnival Horizon* on June 21, 2018. *See* Borcegue Dep. at 30:10-32:5. Borcegue described how the passenger hit her head on the metal part of the bunk bed in her cabin after placing her luggage underneath that bed. *Id.* Borcegue testified that "it was the – they describe it as the latch bolt, but it was a similar latch bolt or a metal piece, as it was in this case." *Id.* at 32:8-11 The passenger, Schild, provided a witness statement and she received medical attention. *Id.* at 32:12-19 Similar to the Plaintiff here, Schild was injured due to her head striking a metal latch on the upper berth in her cabin. The Court finds that the conditions in Schild's cabin were substantially similar to plaintiff's incident. Both Schild and Plaintiff's injuries were due to hitting their heads on metal components of bunk beds in cabins on the same vessel within a seven-month period, so the two incidents are substantially similar. Although the incident with Schild involved her setting down luggage while Plaintiff's incident involved her picking up a fallen water bottle, that is not a substantial difference.

Moreover, the injuries in the June 21, 2018 incident support the conclusion that the condition in Plaintiff's cabin was dangerous. That circumstance distinguishes the instant case from the one on which Defendant relies for the proposition that the condition here is not dangerous. *See* ECF No. [100] at 5 (citing *Malley v. Royal Caribbean Cruises, Ltd.*, 713 F. App'x 905, 909) (11th

Cir. 2017)). In *Malley*, the court stated that the defendant "did not know that the [condition] was dangerously high" since there was "no evidence that a passenger had ever been injured, or even complained, before." *Malley*, 713 F. App'x at 909. Here, Borcegue's testimony established the passenger was injured and received medical attention. *See* Borcegue Dep. at 33:4-11 (testifying that the passenger "was given staples to close her wound").

Thus, to the extent evidence of the prior incident is admissible, constructive notice may be established and summary judgment is not warranted as to Count II.

   b. *Negligent Design of the Cabin*

Defendant submits that Plaintiff's negligent design claim, Count II, fails because "there is no evidence to support Plaintiff's allegations to establish Carnival was involved in the design or construction of the subject cabin or upper bunk." ECF No. [100] at 12. In other words, Defendant argues there is no dispute that Defendant did *not* breach its duty of reasonable care because it is *not* responsible for the design of the cabin. *Mendel v. Royal Caribbean Cruises, Ltd.*, 2012 WL 2367853, at *2-3 (S.D. Fla. June 21, 2012) ("A cruise line is not liable for any alleged improper design if the plaintiff does not establish that the ship-owner or operator was responsible for the alleged improper design."). In support, Defendant relies on *Groves v. Royal Caribbean Cruises, Ltd.*, 463 F. App'x 837 (11th Cir. 2012), in which the Eleventh Circuit stated that a plaintiff cannot sustain a negligent design claim on a motion for summary judgment absent evidence that a defendant-cruise line "actually created, participated in, or approved the alleged negligent design of these areas . . . where [the plaintiff] was injured." *Groves v. Royal Caribbean Cruises, Ltd.*, 463 F. App'x 837 (11th Cir. 2012).

Plaintiff responds that there is evidence Defendant chooses the design of its cabins, including the placement of the refrigerator relative to the bunk bed. ECF No. [106] at 2. Moreover,

Defendant's New Builds Department has the ultimate say and approval over the design and layout of the cabins and evidence exists that Defendant at least participated in or approved the negligence design of Plaintiff's cabin area. *Id.*

As this Court has previously explained, liability based on negligent design would require that Carnival "actually created, participated in, or approved the alleged negligent design" of the staircase. *Johnson v. Carnival Corp.*, No. 19-CV-23167, 2021 WL 1341526, at *9 (S.D. Fla. Apr. 9, 2021) (citing *Groves*, 463 F. App'x at 837). The question is thus whether there is a dispute of fact as to whether Defendant created, participated in, or approved a negligent design.

Borcegue testified to the following. All *Carnival Horizon* cabins are configured similarly. May 12, 2023 Borcegue Dep. at 42:10-43:1. The director of Defendant's New Builds Department is "involved" with the vessel manufacturers' decisions about the placement of the bunkbed, the fridge, and other "configurations" in a cabin. *Id.* at 135:24-136:8. When a manufacturer presents a certain design to the New Builds Department, the department "look[s] at everything just to make sure that everything is functional and that everything is working as it should. At [that] point in time, they would go ahead and . . . go forward with the design." June 26, 2023 Borcegue Dep. at 12:14-13:16. The director chooses the layout of the cabin and all the furnishings that would go into the cabin, and all the dimensions of the furnishings. May 12, 2023 Borcegue Dep. at 136:12-20. In the light most favorable to Plaintiff and drawing all inferences in her favor, that testimony supports that Defendant participates in and approves the layout of the cabin in the *Carnival Horizon*. That testimony distinguishes this case from the one in *Groves* where there was *no* evidence of the cruise line's participation in the design of an area on a vessel. Accordingly, summary judgment is denied as to Count II.

Case No. 22-cv-20858-BLOOM/Otazo-Reyes

iv.    **Count III**

Defendant seeks summary judgment on Count III, Negligent Failure to Warn, on the ground that the purported dangerous condition in Plaintiff's cabin was open and obvious, obviating the need for a warning. *Id.* at 14-20.[9] In other words, Defendant argues its duty of reasonable care does not extend to warning Plaintiff of the dangerous condition posed by the upper berth, assuming it owed any duty to Plaintiff at all. *Carroll*, 955 F.3d at 1265 (holding defendant had no duty to warn where danger associated with walkway was open and obvious). Plaintiff does not substantively respond to this argument.

"A dangerous condition is one that is not apparent and obvious to a passenger[.]" *Stewart*, 365 F. Supp. 3d at 1275. "A cruise line does not need to warn passengers or make special arrangements for open-and-obvious risks. . . . In determining whether a risk is open and obvious, we focus on what an objectively reasonable person would observe and do not take into account the plaintiff's subjective perceptions." *Horne v. Carnival Corp.*, 741 F. App'x 607, 609 (11th Cir. 2018). This Court has previously considered whether a danger is open and obvious in *Price v. Carnival Cruise Lines*, No. 20-CV-20621, 2022 WL 2713727 (S.D. Fla. July 13, 2022). In that case, the plaintiff testified that she "could have" and "should have" seen a round metal clamp in the walkway of Deck 4 of the vessel *M/S Carnival Valor* that caused her fall, and that the clamp was "shiny[.]" *Price v. Carnival Cruise Lines*, No. 20-cv-20621, 2022 WL 2713727, at *1, *7 (S.D. Fla. July 13, 2022). Based on that testimony, the Court determined "any reasonably prudent person through the exercise of common sense and the ordinary use of his/her eyesight could have noticed the clamp and any danger it could have posed." *Id.* at *8.

---

[9] Notably, Defendant does not argue that the alleged hazard's open and obvious character requires that the Court enter summary judgment on Count II. The Eleventh Circuit has explained that the open and obvious nature of a danger is relevant to a cruise ship operator's duty to warn. *Carroll*, 955 F.3d at 1264.

Here, Plaintiff testified that the metal latch was visible from various viewpoints in the cabin. Plaintiff testified that the metal latch is visible to an observer when entering the cabin, Mar. 10, 2023 Canyes Dep. at 510:8-20, when sitting directly underneath the upper berth, *id.* at 510:25-511:2, when standing and "facing the wall" while also facing the upper berth, Apr. 5, 2023 Canyes Dep. at 30:3-10, and when observing an individual in the cabin who is "on the bed" underneath the upper berth, Mar. 10, 2023 Canyes Dep. at 54:21-55:16. Because Plaintiff concedes that the metal latch is visible from multiple vantage points inside the cabin, any reasonably prudent person would have noticed the metal latch and any danger it could have posed. As such, the hazard posed by the metal latch was open an obvious, so Defendant had no duty to warn. Accordingly, Plaintiff cannot show Defendant breached a duty of reasonable care owed to Plaintiff by failing to warn. Summary judgment is thus warranted on Count III.

### v.    Request for Hearing

Plaintiff requests a hearing on the Defendant's Summary Judgment Motion pursuant to Local Rule 7.1(b)(2). However, the Court determines that oral argument is unnecessary given the foregoing discussion.

### B.   *Daubert* Motion

### i.    Nicholas D.A. Suite

Defendant seeks to exclude the testimony of Suite. The *Daubert* Motion identifies Suite's expert report as Exhibit A. ECF No. [101] at 3. However, Exhibit A is a "Follow-Up Evaluation" dated January 10, 2023, ECF No. [104-1]. Defendant attaches Exhibit B, the July 7, 2023 deposition of Suite, ECF No. [104-2]; and Exhibit C, the July 28, 2023 deposition of Suite, ECF No. [104-3]. The July 7, 2023 deposition refers to an "October 2019 Report," ECF No. [104-2] at

4,[10] and the July 28, 2023 deposition refers to a "January 2020 Addendum Report" and a "January 2023 Report," ECF No. [104-3] at 4. The July 7, 2023 deposition makes further reference to "Independent Medical Examination" being the title of the October 2019 Report. ECF No. [104-2] at 32:10-17.

The foregoing shows Defendant's Exhibit A is not Suite's report, and the Court's review of the record confirms Suite's report has not been filed with the Court.[11] Since Suite's expert report is not part of the record, it cannot at this point fulfill its gatekeeping function under *Daubert* with respect to Suite's proffered testimony. Accordingly, the *Daubert* Motion is denied as to Suite.

### ii.   Cheri Surloff

Surloff prepared a neuropsychological report dated January 2, 2023 after being referred to assess Plaintiff's "cognitive and emotional status." Ex. E, Neuropsychological Rep. dated Jan. 2, 2020 ("Surloff Report"), ECF No. [104-5]. The Surloff Report sets forth Plaintiff's relevant medical history, notes Surloff's observations of Plaintiff, and lists the tests that Surloff administered during the referral, along with the test results. Surloff Rep. at 2-9. The Surloff Report states that Plaintiff suffers from a mild neurocognitive disorder due to TBI and depression. *Id.* at 15.

Defendant argues that Surloff's testimony should be excluded as unreliable for lack of a sufficient factual basis and because Surloff incorrectly applied an appropriate methodology. ECF

---

[10] The deposition transcript contains a reporter's note that "Defendant's Exhibit Nos. 1 through 4 were retained by Mr. Perez and are not attached to the deposition transcript." ECF No. 104-2 at 3.

[11] In making this determination, the Court reviewed to no avail the docket sheet in this case, the exhibits to Defendant's Daubert Motion, ECF Nos. [104-1] – [104-31], the exhibits to Defendant's Statement of Material Facts, ECF Nos. [99-1] – [99-10], the exhibits to Defendant's Summary Judgment Motion, ECF Nos. [100-1] – [100-8], the exhibits to Defendant's Motions in Limine, ECF Nos. [103-1] – [103-15], and the exhibits to Defendant's Reply in support of its Summary Judgment Motion, ECF Nos. [199-1] – [119-5], [121-1] – [121-5], and the exhibits to Defendant's other Replies, see ECF Nos. [117], [118], [120].

No. [101] at 9. Defendant points to Surloff's deposition testimony to show that Surloff does not

know the extent of Plaintiff's past injuries, such as Plaintiff's head injury that predates the incident,

and Surloff admitted she did not have available Plaintiff's medical records when writing her report.

*Id.* Defendant maintains Surloff is unaware of Plaintiff's family history, unaware that Plaintiff took

the Florida broker's exam after her alleged incident, and did not consider factors such as Plaintiff's

financial problems or family issues. *Id.* Moreover, Defendant points out that Surloff admitted she

is not qualified to opine on Plaintiff's Diffusion Tensor Imaging ("DTI") evaluation and

improperly attempts to bolster Suite's testimony, the credibility of Plaintiff, and that of her family.

*Id.* at 10. Plaintiff does not respond to Defendant's arguments.

Apart from Defendant's general citation to the standards set forth in Rule 702 and *Daubert*,

Defendant's attacks on Surloff's methodology and qualifications are legally unsupported.

Although Defendant cites extensively to Surloff's deposition testimony to point to Surloff's lack

of consideration for Plaintiff's medical history prior to the incident in this case, Defendant has not

shown that the purported deficiencies in Surloff's opinion bar its admissibility. *See Ward v.

Carnival Corp.*, No. 17-24628-CV, 2019 WL 1228063, at \*11 (S.D. Fla. Mar. 14, 2019) (finding

that contentions regarding expert's failure to rule out certain pre-existing medical conditions prior

to reaching his conclusions more appropriate for cross examination than for excluding expert's

testimony (citing *Jones*, 861 F.2d at 663 ("On cross-examination, the opposing counsel is given

the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the

testimony's weight and credibility."))). The Court is therefore unpersuaded that Surloff's

testimony should be excluded at trial. *See Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116,

1126 n.4 (S.D. Fla. 2019) ("Generally, a litigant who fails to press a point by supporting it with

pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the

face of contrary authority, forfeits the point. The court will not do his research for him.") (internal

quotations and citation omitted). As for whether Surloff is qualified to opine on the DTI evaluation,

Defendant points out that Surloff's statement during her deposition makes plain she is unqualified

to opine on DTI evaluations. ECF No. [104-9] at 113:10-12 (stating that Surloff could not comment

on Passero's analysis of Plaintiff's "frontal lobe difficulty" using DTI because she is not a

neuroradiologist). However, that testimony does not necessarily mean that Surloff cannot rely on

Passero's analysis in forming her opinions, and the Court does not find exclusion of Surloff's

testimony on the DTI evaluation is warranted.

Defendant correctly notes that "[t]he burden of laying the proper foundation for the

admission of expert testimony is on the party offering the expert, and the admissibility must be

shown by a preponderance of the evidence." ECF No. [117] at 2 (citing *Kilpatrick v. Breg, Inc.*,

613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *McCorvey*, 298 F.3d at 1256)). Certainly, Plaintiff

ultimately bears the burden to demonstrate her expert's testimony is admissible at trial, and the

Court may exclude such testimony where Plaintiff fails to address Defendants' arguments. *Lewis*,

2021 WL 4991102, at *4. Nevertheless, to the extent Plaintiff has failed to respond to Defendant's

challenges to this and Plaintiff's other experts, that circumstance does not warrant excluding the

testimony where the Court has determined Defendant as the movant has failed to carry its burden.

*Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the

parties to formulate arguments."). Because Defendant has not demonstrated that Surloff's

testimony is inadmissible, the exclusion of Surloff's testimony is not warranted.

### iii.    Melissa Ortiz-Becher

Ortiz-Becher submitted an expert report dated April 20, 2023. Ex. H, Confidential Progress

Rep. ("Ortiz-Becher Report"), ECF No. [104-8]; *see also* ECF No. [104-9] at 51 (identifying

Confidential Progress Report as expert report). Ortiz-Becher identifies herself as a licensed clinical psychologist and opines that Plaintiff "has been experiencing and having problems with balance, depth perception, visual perception deficits, vertigo, debilitating complex migraines, sensitivity to light, memory . . . problems, loss of sense of smell and taste, and electric shocks in her tongue." ECF No. [104-8] at 2. Ortiz-Becher notes that the most recent neuropsychological evaluation performed by Dr. Jorge A. Herrera indicated "significant cognitive deficits" and Plaintiff received a diagnosis of "Mild Neurocognitive Disorder Due to Brain Traumatic Injury." *Id.* Ortiz-Becher opines that Plaintiff suffers from "Major Depressive Disorder, Recurrent, Moderate, Generalized Anxiety Disorder," and TBI. *Id.* Ortiz-Becher opines that Plaintiff's "current emotional issues are a direct and proximate result of the accident that she experienced on the cruise ship" and that, "[b]ut for the injuries that she suffered as a result of the incident on the cruise ship, she would not be suffering from depression and anxiety, and [Plaintiff] would not be in need of psychotherapy." *Id.*

Defendant challenges Ortiz-Becher's testimony on the grounds that she is unqualified because she is neither a medical doctor nor an expert on TBI but notes that she has treated "a handful of patients with TBI over the course of her career." ECF No. [101] at 10-11. Moreover, Defendant argues in part that Ortiz-Becher's opinions are based on an unreliable methodology. Defendant particularly contends that Ortiz-Becher may not testify as to the cause of Plaintiff's emotional issues because her testimony is premised on the "temporal proximity" between the incident and those issues; since she was required to perform a differential diagnosis to proffer such testimony, Ortiz-Becher's opinion must be excluded. *Id.* at 11.

Plaintiff responds that Ortiz-Becher is qualified because she has treated patients with the same injury. ECF No. [110] at 5. Plaintiff asserts that Defendant's criticisms are not properly

attacks on her methodology, are more appropriately raised through cross examination, and do not justify the exclusion of Ortiz-Becher's opinions. *Id.* at 3.

The Court agrees with Defendant that Ortiz-Becher's opinion is unreliable. Ortiz-Becher's proffered testimony suffers from "a classic 'post hoc ergo propter hoc' fallacy which 'assumes causation from temporal sequence.'" *See Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963 (11th Cir. 2013) (quoting *Kilpatrick*, 613 F.3d at 1336). As the Ortiz-Becher Report demonstrates, Ortiz-Becher impermissibly connects Plaintiff's current emotional issues and the incident only by her say so. *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1201 (11th Cir. 2010) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Absent from the Ortiz-Becher Report is any indication that Ortiz-Becher sought to eliminate other potential causes of Plaintiff's Major Depressive Disorder or Generalized Anxiety Disorder. The deposition of Ortiz-Becher confirms that she based her opinion on the severity and temporal proximity of Plaintiff's emotional issues and the incident, but she did not seek to rule out other causes:

> **Q.** Okay. Second paragraph, you wrote, "It is my opinion that Ms. Canyes's current emotional issues are a direct and proximate result of the accident that she experienced on the cruise ship." Why can't it be something else, Doctor?
> **A.** Because the situations that happen in life, it could be a temporary situation and not necessarily have to effect [*sic*] your functioning in terms of your brain functions, in term of your cognitive abilities. And when you have a specific event that changes something and then you have to link the two of them as the cause of it. . . . So when you have a major event in your life, especially you have a situation where you hit your head and, after that, you cannot function the way that you think that you function before, it was a correlation right there. . . .
> **Q.** So it's based on temporality?
> **A.** What do you mean?
> **Q.** She says she has an accident January 15, 2019, she starts making complaints, you're linking the two things just based on a time relationship?
> **A.** A time --
> MR. MILLER: Object to form.

You can answer.

THE WITNESS: -- and severity.

ECF No. [104-10] at 169-70. Given Ortiz-Becher's reliance on the temporal proximity between her symptoms and the incident, her testimony would be unreliable and must be excluded on that basis. *See Cooper*, 539 F. App'x at 967 (excluding experts' opinion where their methodology "amounted to simple reliance on a temporal relationship").

### iv.   Tamar Fleischer

Fleischer submitted a report that purports to "outline those services that [Plaintiff] requires to promote independent function, maximize quality of life, and provide for her physical and emotional well-being, specific to the January 2019 accident." ECF No. [104-11] at 4 ("Fleischer Report"). The Fleischer Report notes that the life expectancy for a sixty-year-old female is 24.9 years. *Id.* (citing *Nat'l Vital Statistics Rep.*, 2019 United States Life Tables, Vol. 70:19 (Mar. 2022)). In a section titled Medical History, the Fleischer Report recounts Plaintiff's medical history starting from the date of the incident. *Id.* at 5-8. The Fleischer Report summarizes the total cost for Plaintiff's needs in a table that lists in separate columns Plaintiff's One-Time Costs and Annual Cost for Medical Surveillance and Medications / Equipment. *Id.* at 9 tbl. The table multiplies the Total Annual Cost for the annual costs by Plaintiff's life expectancy, 24.9 years. *Id.*

Defendant seeks the exclusion of Fleischer's testimony on the grounds that she is unqualified to prepare a life care plan, she did not speak to physicians except for Suite prior to formulating Plaintiff's life care plan and failed to account for Plaintiff's medical history prior to the incident. ECF No. [101] at 12. Moreover, Defendant asserts Fleischer is unqualified to testify on the life care plan because she lacks specialized knowledge for doing so and conducted no differential diagnosis analysis. *Id.*

Plaintiff responds that Fleischer is qualified to testify given her experience as a litigation

consultant who authors life care plans for other individuals who have TBI. ECF No. [110] at 4-5.

Further, Plaintiff asserts that the Fleischer Report is based on Fleischer's review of at least twenty

different records relating to Plaintiff's medical history and consulted five sources for her cost

estimates. *Id.*

Defendant replies that Fleischer's experience does not qualify her to testify on a life care

plan because it is not clear how her experience leads to her opinion, why her experience is a

sufficient basis for the opinion, and how that experience is reliably applied to the facts. ECF No.

[117] at 4. Defendant further replies that Fleischer cannot opine on Plaintiff's life care plan, even

though she has authored life care plans for TBI patients, because Fleischer has never treated TBI

patients herself. *Id.* at 5.

The Fleischer Report relies on treating psychologist Neil Applebaum, Psy.D's diagnosis,

that Plaintiff sustained a mild traumatic brain injury when she hit her head on January 15, 2019.

Fleischer Rep. at 4, 6. The Fleischer Report also details the complications that Dr.Surloff

diagnosed as stemming from Plaintiff's mild TBI. *Id.* at 6. Based on a review of several medical

documents that describe those complications, Fleischer further opines that Plaintiff's mild TBI

"has impacted many aspects of [Plaintiff's] life, including vocational and recreational

opportunities, interpersonal relationships, comfort, and independence." *Id.* at 8, 14. On that basis,

the Fleischer Report estimated the total cost for Plaintiff's medical needs, setting forth an

explanation of the costs of Plaintiff's life care plan, including counseling and cognitive therapy for

her mild TBI. *Id.* at 9, 11.

Moreover, at her deposition, Fleischer testified that she authored "many life care plans for

individuals who have had traumatic brain injury" as a life care planner. ECF No. [104-12] at 52.

In addition, she attended a rehabilitating nursing conference in November 2021 that concerned

costing for life care plans titled "Collaboration and Goal Setting with Chronic Complications of TBI." *Id.* at 23:6-13. That testimony shows that Fleischer has experience in providing life care plans for patients with TBI—meaning that Fleischer's experience is germane to Plaintiff's care to the extent Plaintiff suffers from mild TBI—and supports that Fleischer, who is trained on costing life care plans for those with chronic TBI complications, reliably applied her experience to the facts of this case. Fleischer is thus qualified to testify on Plaintiff's life care plan based on her experience. *See Frazier*, 387 F.3d at 1261 (citing Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("The Committee Note to the 2000 Amendments of Rule 702 . . . explains that '[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.'")). Although Fleischer may not be qualified to treat mild traumatic brain injury, *see id.* at 53:9-16, Defendant fails to explain how her lack of experience disqualifies her from preparing a life care plan for the care that a mild TBI patient requires.

Moreover, because Defendant does not dispute the validity of life care planning as a damages methodology, or the calculations on which Fleischer's costs are based, the Court's review of the Fleischer Report leads to its conclusion that Fleischer's proffered opinion represents the reliable application of life care planning. *See Frazier*, 387 F.3d at 1261 ("[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis in *Frazier*)). Further, because Fleischer's calculations are helpful to the jury in determining damages, that opinion is admissible.

Defendant relies on *Collett v. Scott Fisher & Robert Bearden Inc.* to argue Fleischer's

methodology is unreliable, but that reliance is misplaced. Defendant cites *Collette* for the proposition that Fleischer's opinion is based on insufficient facts or data, but the court in that case excluded the expert's opinion in that case on that basis because the sought to offer a causation opinion based on insufficient facts. *Collett v. Fisher*, No. 3:19-CV-1468-HES-MCR, 2022 WL 710249, at *3 (M.D. Fla. Jan. 19, 2022). But Fleischer is not offering a causation opinion, so *Collett* provides this Court with little guidance on Fleischer's opinion. Moreover, contrary to Defendant's assertion, *Collett* does not require Fleischer to have done a differential diagnosis before developing a life care plan. To the extent Fleischer's failure to perform a differential diagnosis undermines the calculations in Plaintiff's life care plan, Defendant has not shown that that deficiency is grounds for the exclusion of her testimony, rather than a basis to undermine that testimony through cross examination. *Collett* thus does not support Defendant's argument. Accordingly, Fleischer's opinion is not due to be excluded.

>           **v.    Amanda M. Sizemore**

Defendant seeks to exclude testimony by Sizemore concerning her opinion that Plaintiff's "pre-injury earning power ranged from $50,250.00 to $60,740.00 for full-time work as a General Sales Representative or Real Estate Sales Agent, respectively." ECF No. [101] at 13-14 (quoting ECF No. [104-13] at 4 ("Sizemore Report")). Defendant maintains that Plaintiff's tax records that are included in Sizemore's Report and Plaintiff's actual earning history do not support Sizemore's assumptions about Plaintiff's pre-incident potential income. *Id.* Moreover, Defendant submits that Sizemore failed to thoroughly review Plaintiff's medical background and is not qualified to opine on medical issues. *Id.* at 14. Plaintiff argues Sizemore is qualified to opine on Plaintiff's medical issues because those issues relate to Plaintiff's ability to perform work in the future. ECF No. [110] at 5. However, Plaintiff does not substantively respond Defendant's attacks on Sizemore's

methodology.

As with Defendant's attacks on Surloff's testimony, Defendant's arguments to exclude Sizemore's testimony are unsupported by citations to legal authorities. As such, the exclusion of Sizemore's testimony is not warranted.

### vi.   Kenneth Eugene Lehrer

Defendant seeks to exclude Lehrer's opinion, an economic expert, on the grounds that the opinion relies solely on the Fleischer Report and Sizemore Report. ECF No. [101] at 14. Defendant does not attack Lehrer's qualifications or the reliability of his methodology, as applied. Thus, to the extent that Lehrer's opinions are based on either the Fleischer Report or on Sizemore's opinions, Lehrer may testify.

### vii.   Jose Pizarro

Pizarro submitted a report in which he opines that Plaintiff's brain shows indications of a post-traumatic axonal shearing injury based in part on an analysis of diffusion tensor imaging (DTI). According to the Radiological Society of North America, MRI diffusion tensor imaging is an advanced neuroimaging technique. ECF No. [104-18] at 2. ECF No. [104-16] at 10 ("Pizarro Report"). That testimony would be relevant to whether the January 15, 2019 incident caused the axonal shearing injury. *See id.* at 9 (opining that report's findings "may represent the sequela of injury to the head on January 15, 2019"). The Pizarro Report states in part that in Plaintiff's "left frontal lobe, there is a gray-matter interface T2 hyperintense lesion" that has increased in size and is consistent with "progression of the structural changes related to shearing injury in this case" and not with multiple sclerosis. ECF No. [104-16] at 10. The Pizzaro Report further states that there are three "punctuate lesions" in the left frontal lobe gray-white matter interface that are consistent with "micropetechial hemorrhage" from shearing injury. *Id.* Moreover, the Pizzaro Report states

that the grey-white matter interface is "a common location for post-traumatic axonal shearing injury." *Id.* The Pizarro Report asserts that "[w]hole brain analysis" demonstrates "visible reductions in fractional anisotropy," which is seen in groups of patients that are diagnosed with white matter injury. The Pizarro Report concludes that its findings are consistent with post-traumatic axonal shearing injury, which is a correlate for post-concussion syndrome. *Id.*

Defendant seeks to exclude Pizarro's testimony on the ground that DTI is unreliable under the *Daubert* standard. Defendant contends there are doubts in medical publications and law review literature on whether DTI has a known rate of error, whether it is generally accepted by the scientific community when used to prove a patient suffers from mild TBI, and at least one New York state court has excluded testimony based on DTI. ECF No. [101] at 15. Nevertheless, Defendant acknowledges that at least one court in this district, among others, have admitted DTI evidence. *Id.* at 16-17. Moreover, Defendant contends that Pizarro's admission that he could not determine when her brain injury occurred without a prior MRI of Plaintiff's brain, and Pizarro's failure to review Plaintiff's medical records in formulating his opinion, render his testimony unreliable. *Id.* at 17. As with Defendant's attacks on the Plaintiff's other experts' opinions, Plaintiff does not substantively respond to those arguments.

As Defendant points out, at least one court in this district has determined that DTI is a reliable method, especially when used in conjunction with other medical tests and assessments. *Marsh v. Celebrity Cruises, Inc.*, No. 1:17-CV-21097-UU, 2017 WL 6987718, at *4 (S.D. Fla. Dec. 15, 2017). The Court finds *Marsh* to be persuasive on its own terms. *Marsh* considered DTI under the Eleventh Circuit's three-part test to determine whether expert testimony should be admitted under *Daubert*. Specifically, *Marsh* found that DTI is a generally accepted method for analyzing and diagnosing TBI, has been peer-reviewed extensively, and has a documented rate of

error. *Marsh*, 2017 WL 6987718, at *3-4.

Moreover, Defendant's other arguments against Pizarro's testimony are unpersuasive. The Pizarro Report is careful to note that the DTI scan of Plaintiff's brain is consistent with TBI, not that Pizarro's DTI analysis conclusively establishes that Plaintiff suffers from TBI. Pizarro's testimony would be helpful to the trier of fact in conjunction with other medical testimony in considering whether Plaintiff is suffering from TBI as a result of the incident. *Id.* at *4. The fact that Pizarro did not compare his DTI findings with a pre-injury MRI of Plaintiff goes to the weight of the expert's opinion and does not warrant excluding Pizarro's opinion. As such, the *Daubert* Motion is denied as to Pizarro's testimony.

### viii.    Gerald Martin Goldhaber and Roy Scott

Defendant seeks to exclude the testimony of Goldhaber and Scott. Goldhaber seeks to testify on whether Defendant provided adequate warning to Plaintiff on the hazard presented by the metal latch. ECF No. [104-26] at 21. However, because the Court has determined that summary judgment is warranted on Plaintiff's negligent failure to warn claim, the Court proceeds only to consider the Scott Report, ECF No. [104-23], and the Scott Supplemental Report, ECF No. [104-23]. Those reports show that Scott seeks to testify that Plaintiff's cabin does not comply with the standards promulgated by the American Bureau of Shipping (ABS) and the International Labor Organization (ILO). ECF No. [104-23] at 3. Specifically, the Scott Supplemental Report states that there is a nine-inch minimum gap between a bed and the vessel bulkhead due to the presence of a nightstand. ECF No. [104-24] at 3. Moreover, the Scott Supplemental Report states that "the entire bottom of the frame for the support of the upper [berth] is approximately 50 3/8'," which is less than the ILO's Title 3 requirement that headroom for all passageways be 80.8 inches clear of any obstructions. ECF No. [104-23] at 4. Further, Scott seeks to testify that there is a seven-inch

31

overhead obstruction where the metal latch is located given how the length of the upper berth extends seven inches beyond the length of the lower bed. *Id.* at 7-8.

Defendant first argues that Scott relied on a photograph taken of a cabin in a Disney Cruise Line vessel and that Scott should not be allowed to testify based on that photograph. ECF No. [101] at 17-18 (citing Ex. AC, ECF No. [104-29]). Plaintiff does not contest that the "Disney" photograph is irrelevant. As such, Scott's testimony is precluded to the extent it relies on that photograph.

Defendant argues the ABS and ILO standards are irrelevant to the instant case because those standards are for crew members and not passengers. *Id.* at 18. However, a defendant cruise line's purported failure to follow industry standards is probative of the standard of care. *Cf. Carroll*, 955 F.3d at 1269-70 (holding that expert's testimony that cruise line's maintenance of a walkway did not adhere to industry standards was relevant to standard of care). To the extent there is evidence that the standard of care is lower for passengers than for crew members, that evidence undermines the weight of Scott's testimony, but not its admissibility. Moreover, to the extent the standard of care is higher, the ABS and ILO standards would be *a fortiori* probative of the standard of care in this case.

Defendant faults Scott for failure to perform "any kind of scientific testing or analysis during his vessel inspection," but as Plaintiff correctly observes, not all expert testimony requires "scientific testing or analysis." As the Eleventh Circuit has recognized, expertise may be based on non-scientific experience. *Cf. Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) (holding expert testimony that was based on personal experience admissible to establish "the passport-stamping practices of Mexican immigration officials" even in the absence of any "verifiable testing or studies"). Defendant asserts that Scott's opinion is a legal conclusion that is not helpful to the trier

of fact. ECF No. [101] at 20 (citing *Jordan v. Celebrity Cruises, Inc.*, No. 1:17-20773-CIV, 2018 WL 3584702, at *9 (S.D. Fla. July 25, 2018)). However, Defendant's reliance on *Jordan* is misplaced. The expert in *Jordan* sought to testify that the plaintiff "did nothing to contribute to her accident and subsequent injuries." *Jordan*, 2018 WL 3584702, at *9. *Jordan* reasoned that opinion was an impermissible legal conclusion because it amounted to a determination that the plaintiff was not at fault, an assertion amounting to an instruction to the jury of "what result to reach", but *Jordan* explained that the Court, not the expert, "must be the jury's only source of law" in reaching a verdict. *See id.* (citations omitted). As the foregoing shows, Scott seeks to testify on the cabin's non-compliance with certain industry standards; Scott is not testifying that Defendant negligently designed Plaintiff's cabin. Contrary to Defendant's contention, such testimony is relevant to the issue of the applicable standard of care and helpful to the trier of fact. Nor is it determinative that "Mr. Scott does not have a naval architecture degree." ECF No. [101] at 20. Defendant has presented no authority supporting that Scott needs such a degree to offer his testimony. To the extent that Plaintiff can lay a foundation for Scott's qualifications, Scott's testimony on industry standards is admissible, and there is a basis to conclude that Scott is qualified. *See* ECF No. [104-23] at 4 (identifying self as "ABYC Standard Accredited"). Accordingly, the Motion is denied as to Scott's testimony.

IV. **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment, **ECF No. [100]**, is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is granted as to Counts I and III but denied as to Count II.

2. Defendant's *Daubert* Motion to Strike Plaintiff's Expert Witnesses, **ECF No. [101]**, is **GRANTED IN PART AND DENIED IN PART.**

33

Case No. 22-cv-20858-BLOOM/Otazo-Reyes

a.  The *Daubert* Motion is granted as to the testimony of Dr. Melissa Ortiz-Becher, Psy.D., LMHC;

b.  The *Daubert* Motion is denied as to the testimony of Amanda Marie Sizemore, M.S., Dr. Gerald M. Goldhaber, Ph.D., Dr. Jose Pizarro, M.D., Dr. Nicholas D. A. Suite, M.D., and Dr. Cheri Surloff Ph.D., Psy.D., and Tamar Fleischer, R.N.; and

c.  The *Daubert* Motion is granted in part and denied in part as to the testimony of Dr. Kenneth Eugene Lehrer, Roy J. Scott.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 31, 2023.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record